**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CINDY G. TAYLOR,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 3:04-CV-2340-M** |
| **v.** | § | |
| | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and an Order of the Court in implementation thereof, subject cause has been referred to the United States Magistrate Judge.  Before this Court are Plaintiff's *Opening Brief*, filed April 28, 2005, Defendant's *Motion for Summary Judgment* and *Defendant's Response to Plaintiff's Opening Brief and Memorandum in Support of Summary Judgment,* both filed July 27, 2005, and *Plaintiff's Reply Brief*, filed electronically on August 22, 2005.  Having reviewed the evidence of the parties in connection with the pleadings, the undersigned recommends that the Plaintiff's motion be **DENIED,** Defendant's cross *Motion for Summary Judgment* be **GRANTED,** and the decision of the Commissioner be wholly **AFFIRMED**.

## I.    BACKGROUND[1]

### A.    Procedural History

Cindy G. Taylor ("Plaintiff") seeks judicial review of a final decision by the Commissioner

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

of Social Security ("Commissioner") denying her claim for disability benefits under Title II and

Title XVI of the Social Security Act.  On October 8, 2002, Plaintiff filed an application for

disability benefits under Title II; on December 30, 2002, Plaintiff filed an application for disability

benefits under Title XVI.  (Tr. at 173-182; 567-569.)  Plaintiff claimed she was disabled due to

uncontrolled diabetes, hypertension, and two small strokes.  (Tr. at 174.) At the hearing, Plaintiff

also alleged severe headaches, nausea, fatigue, and chest pain as disabling symptoms.  (Tr. at 71,

81, 83.)  Plaintiff's applications were denied initially and upon reconsideration.  (Tr. at 157-163,

570.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at

155.)  A hearing, at which Plaintiff personally appeared and testified, was held on February 27,

2004.  (Tr. at 52-53.)  On April 1, 2004, the ALJ issued his decision finding Plaintiff not disabled.

(Tr. at 42-48.)  Plaintiff submitted additional information to the Appeals Council when filing her

request for review.  (Tr. at 10-28.)  The Appeals Council reviewed Plaintiff's new evidence before

denying her request for review, concluding that the new evidence did not provide a basis for

changing the ALJ's decision.  (Tr. at 5-8.)  Thus, the ALJ's decision became the final decision of

the Commissioner.  (Tr. at 5.)  Plaintiff then brought this timely appeal to the United States District

Court pursuant to 42 U.S.C. § 405(g) on October 29, 2004.

**B.**    ***Factual History***

      **1.**    <u>**Age, Education, and Work Experience**</u>

Plaintiff was born on October 26, 1958.  (Tr. at 118.)  At the time of the hearing before the

ALJ, she was 45 years old.  (Tr. at 56.)  Plaintiff has a high school diploma.  (Tr. at 58-59.)  Her

past relevant work experience included work as Assistant Director of a daycare, quality control

monitor for videotapes, and photo lab supervisor.  (Tr. at 175.)  In addition, Plaintiff had four

positions of short duration since the alleged onset of her disability, including a string machine worker, daycare employee, shrink wrapper of tags and labels, and a box loader at a Blockbuster warehouse.  (Tr. at 60-64.)

> 2.     **Medical Evidence**[2]

On September 4, 2002, Plaintiff presented herself at the Greenville Presbyterian Hospital emergency room complaining of facial numbness on the left side of her face.  (Tr. at 347.)  Plaintiff was admitted and underwent an MRI on September 4, 2002, that showed "a focal area of elevated diffusion rather than restricted diffusion" "consistent with a prior white matter infarct." (Tr. at 352.)  Plaintiff also underwent a head CT scan which showed "a small, 8 mm, low attenuation focus . . . within the white matter" which "may represent a prior white matter infarct." (Tr. at 355.)  The technologist also noted that there was no hemorrhage, edema or intracranial mass effect." *Id.*  Plaintiff was discharged by Joseph Perks, D.O., with final diagnoses of "Bell's palsy, diabetes mellitus, type II, poorly controlled, and hyperlipidemia" on September 7, 2002.  (Tr. at 449.)

On October 3, 2002, Deborah S. Hughes, R.N., C.F.N.P., conducted follow-up examination of Plaintiff.  (Tr. at 543.)  Nurse Hughes diagnosed Plaintiff with diabetes mellitus, type II and hyperlipidemia, and noted her high blood sugar.  *Id.*  Plaintiff told Nurse Hughes that she could not afford the food for her diabetes mellitus, type II.  *Id.*

On October 19, 2002, Plaintiff presented herself at the Greenville Presbyterian Hospital emergency room complaining that she had been vomiting and had had diarrhea since the previous day.  (Tr. at 341.)  Plaintiff was again diagnosed with hyperlipidemia and diabetes mellitus.  (Tr. at

---

[2] Pages 393-430 appear to be another individual's medical records. There is no evidence in the record that the ALJ relied on any of these records in making his determination concerning Plaintiff's entitlement to disability benefits.

344.)

On December 8, 2002, Plaintiff underwent another CT scan at Hunt Memorial Hospital. (Tr. at 336.)  Earl Tyler, M.D., compared the scan with Plaintiff's September 4, 2002 scan and noted a "small old lacunar infarction" on the left thalamus, "about the same as in September."  *Id.*  Dr. Tyler also noted that no hemorrhagic infarction was seen.  *Id.*

On December 10, 2002, Plaintiff was admitted to the Greenville Presbyterian Hospital with "the worst headache of her life" and associated fever, nausea and vomiting.  (Tr. at 326.)  A CT scan of the brain and spinal tap was negative.  *Id.*  Plaintiff's MRI showed "three small, stable prior lacunar infarcts" but no new mass or infarct.  (Tr. at 330.)  Plaintiff was discharged with a principal diagnosis of migraine headaches, and secondary diagnoses of hypertension, diabetes, coronary vascular disease and Bell's palsy on December 14, 2002.  (Tr. at 326.)

On December 18, 2002, Plaintiff was again admitted to the Greenville Presbyterian Hospital complaining of chest pain.  (Tr. at 307.)  Plaintiff had a stress echo nuclear scan which showed a left ventricular ejection fraction of 54%.  *Id.*  Henry L. Underwood, D.O., noted that Plaintiff had previously undergone two coronary angioplasties and recommended that Plaintiff have a cardiac catheterization.  *Id.*  Plaintiff was discharged on December 21, 2002 with diagnoses of "resolved chest pain, noncardiac, history of coronary artery disease and diabetes mellitus, Type II."  (Tr. at 311.)  A follow up assessment showed Plaintiff without nausea, vomiting, headache or shortness of breath and looked "good." (Tr. at 307.)  When examined, Plaintiff appeared in "no acute distress." (Tr. at 320.)

On January 16, 2003, Plaintiff was examined at the Greenville Presbyterian Hospital emergency room.  (Tr. at 295.)  Her chief complaint was vomiting, but Plaintiff also complained of

blurred vision, and a weakness on her right side more than her left.  *Id.*  The emergency room technician affirmed that Plaintiff had had three "transient ischemic attacks" ("TIA") since September, with the last one in December.  *Id.*  Plaintiff was diagnosed with "diffuse myalgia of lower extremities" and "viral syndrome" and discharged on January 16, 2003.  (Tr. at 299.)  A physical assessment of Plaintiff noted that she "appear[ed] in no acute distress" but "appear[ed] anxious."  (Tr. at 296.)

On January 28, 2003, Plaintiff again presented herself at the Greenville Presbyterian Hospital emergency room complaining that her "legs [were] not working right and they [were] hurting really bad."  (Tr. at 289.)  She also complained of nausea and vomiting.  *Id.*  An examination of Plaintiff showed diffuse tenderness in both thighs.  (Tr. at 292.)  Plaintiff was diagnosed with "uncontrolled, chronic, non-insulin dependent diabetes, diffuse myalgia, possible chronic fatigue syndrome and mild dehydration."  (Tr. at 293.)  Plaintiff was discharged and instructed not to work for two days.  *Id.*

On February 7, 2003, in response to the Texas Rehabilitation Commission's request for Plaintiff's records to determine her disability, Henry L. Underwood, D.O., issued Plaintiff a letter outlining her previous diagnoses.  (Tr. at 430-431.)  These included diabetes mellitus, type II, hypertension, coronary artery disease, diabetic gastroperesis, and cerebral infarctions of the brain.  (Tr. at 431.)  Dr. Underwood referred Plaintiff to several doctors, including a cardiologist for her hypertension and coronary artery disease, an OB/GUN for a female wellness exam, and a gastrointerologist to ascertain the cause of her stomach discomfort.  *Id.*  Dr. Underwood believed that Plaintiff's stomach discomfort was due to her diabetes.  *Id.*  Dr. Underwood scheduled a follow-up appointment for Plaintiff on February 17, 2003, stating that her compliance with this

appointment was "crucially important."  *Id.*  There are no medical records of any follow-up appointment or additional tests in the record.

On March 3, 2003, Plaintiff was seen at the Greenville Community Health Center for a refill on her medications.  (Tr. at 533.)  Plaintiff claimed that she had been discharged from her primary care provider due to "non-compliance with appointments."  *Id.*  Plaintiff further claimed she needed a refill for medications but was unable to pay for them.  *Id.*  Plaintiff was noted as "labile, anxious and agitated at times."  *Id.*  The examiner gave Plaintiff medication samples and asked her to return.  *Id.*  Plaintiff did return on April 2, 2003, and was again given samples because she had run out of her medications three days before.  (Tr. at 532.)  Her general mood was noted as normal. *Id.*

On April 11, 2003, Plaintiff again presented herself at the Greenville Presbyterian Hospital emergency room complaining of ongoing abdominal pain over the past several days. (Tr. at 485.) This pain was categorized as moderately severe, and Plaintiff also complained of nausea and loss of appetite.  *Id.*  Plaintiff was discharged in a stable condition and diagnosed with acute pyelnoephritis and diabetes.  (Tr. at 491.)

On April 30, 2003, Plaintiff was examined at the Greenville Community Health Center. (Tr. at 531.)  Plaintiff's general appearance was described as normal but "anxious."  *Id.*  Plaintiff complained of arm pain for the past four weeks that gone away spontaneously.  *Id.* Plaintiff was diagnosed with lipidemia, "NIDDM" and left arm pain of unknown etiology.  *Id.*

On May 21, 2003, Plaintiff again presented herself at Greenville Community Health Center for a three-week re-checkup.  (Tr. at 530.)  Her general appearance was described as normal, and

her mood was noted as "euthymic."[3] *Id.* Plaintiff's primary diagnosis was "NIDDM - not controlled" and she was again given medication samples. *Id.*

On June 4, 2003, Plaintiff presented herself at the Greenville Presbyterian Hospital emergency room with a blood sugar of 511. (Tr. at 478.) She stated she had been out of diabetes medication for three days and also complained of nausea, dizziness and a headache. *Id.* Plaintiff was diagnosed with "uncontrolled, chronic non-insulin dependent diabetes." (Tr. at 479.) While at the clinic, Plaintiff's blood sugar was reduced to 184 and she was given Glucovance. *Id.*

On September 4, 2003, Plaintiff again presented herself at the Greenville Community Health Center claiming she was out of medication. (Tr. at 529.) Her general appearance was described as normal, and she was diagnosed with high cholesterol, hypertension and uncontrolled diabetes mellitus, type II. *Id.*

On October 13, 2003, Plaintiff presented herself at the Presbyterian Hospital of Greenville emergency room complaining of chest pain, nausea, vomiting, and diarrhea. (Tr. at 511.) She was diagnosed with unstable angina, hypertension, diabetes and hypertriglyceridemia and given insulin. *Id.* Plaintiff was transferred to Baylor University Medical Center for possible cardiac catheterization. *Id.* There is no indication from the record that this cardiac catheterization took place.

On October 20, 2003, Plaintiff again presented herself at the Greenville Community Health Center complaining of severe chest pain which she stated had started after lunch the previous day. (Tr. at 528.) After she had slept for forty minutes, she felt better. *Id.* Plaintiff was diagnosed with

---

[3] Defined as "joyful, mental peace or tranquility; moderation of mood, not manic or depressed." (Dictionary.com)

hypertension, diabetes mellitus, type II, and anterior chest wall pain syndrome. *Id.* Diabetes education classes were recommended to get Plaintiff on a 1200 calorie ADA diet. *Id.*

On January 26, 2004, Plaintiff again returned to the Greenville Community Health Center for a three month followup. (Tr. at 527.) Despite Plaintiff's claims that she was taking glucophage she had borrowed from her father, her blood sugar was measured at 348. *Id.* Plaintiff was diagnosed with high cholesterol, hypertension and diabetes mellitus, type II, uncontrolled. Diabetes education classes and a 1200 calorie ADA diet was recommended. *Id.*

On March 1, 2004, Dr. Perks offered a written opinion that Plaintiff was reasonably likely to miss an average of more than two days of work per month due to the combined effects of her physical impairments: "poorly controlled diabetes, episodic chest pain, 'TIA's,' anxiety and episodic headaches." (Tr. at 574.) However, Dr. Perks further stated that he was unable to determine if this opinion had been true since October 11, 2002, the date she last worked, because Plaintiff had not visited the clinic between May 30, 2002 and March 3, 2003. *Id.*

### 3.   **Hearing Testimony**

At the February 27, 2004 hearing, the ALJ heard testimony from Plaintiff, a medical expert, and a Vocational Expert. (Tr. at 50-52.) Plaintiff was represented by an attorney representative. (Tr. at 53.)

#### a.   *Plaintiff's Testimony*

Plaintiff testified that she considered September 1, 2002 as the onset of her disability because that was when her doctors found "TIA's." (Tr. at 59.) Furthermore, despite having a doctor's note declaring her fit to work, her temporary agency laid her off. (Tr. at 59-60.) In June 2003, Plaintiff worked as a daycare employee, caring for six children. (Tr. at 61.) After working

only three weeks, she had to go to the emergency room because she was out of her diabetes medication. *Id.* After this incident, Plaintiff was not re-hired because her employers were fearful of leaving her with alone with the children. (Tr. at 61-62.) Plaintiff testified that she then started working at Innes Tag and Label in January of 2004. (Tr. at 62.) Plaintiff first worked at a shrink wrap machine for two weeks, and then moved to a job sitting at a string machine. *Id.* However, after two weeks at the string machine, she was terminated because she "could not handle the work." *Id.* Plaintiff subsequently worked at a Blockbuster warehouse for three weeks loading boxes on a trailer, but then had to go to the hospital for severe headaches. (Tr. at 64.) Her doctor never gave her a release to return to work. *Id.*

In the 15 years prior to the alleged onset of disability, Plaintiff held four jobs. She worked from January 2002 to September 2002 as a quality control inspector checking VHS cassettes. (Tr. at 65.) Plaintiff would pull one thousand tapes and make sure they were properly recorded. (Tr. at 65-66.) Plaintiff testified that she regularly lifted ten pounds and no more than twenty pounds at this job. (Tr. at 66.)

For eight years prior to that, from January 1993 to the end of 2001, Plaintiff worked as a photo lab supervisor. (Tr. at 66-67.) She supervised twenty to twenty-two employees, "[made] sure the rolls got cut, [and made] sure the work was in order." (Tr. at 67.) She also did the billing, loaded boxes, ensured they were shipped, and gave input on hiring and firing employees. *Id.* Plaintiff testified that she lifted boxes of pictures that weighed up to 75 pounds. *Id.*

For a year and a half prior to that, from the middle of 1990 to the end of 1992, Plaintiff worked as a packager at another photo lab. (Tr. at 69.) She worked putting pictures into envelopes and lifted boxes of pictures weighing up to 75 pounds. *Id.*

Prior to her position as a photo lab packager, from January 1989 to the middle of 1990, Plaintiff worked as an Assistant Director at a daycare center. (Tr. at 70.) Plaintiff testified that the job involved a lot of standing and occasionally lifting children who weighed about forty pounds. (Tr. at 70-71.) Plaintiff supervised workers and children, wrote out tuition receipts, and generally oversaw operations. (Tr. at 71.) Plaintiff testified that prior to 1989, she had always worked at a daycare. *Id.*

Plaintiff testified that she felt the chief medical impairment preventing her from working was her headaches. *Id.* Although she could not pinpoint when she started having them, Plaintiff testified that they became severe around the time she was working as a quality control inspector for the video company in September 2002. (Tr. at 71-72.) However, Plaintiff felt that she had not complained about the severity of her headaches to her doctors until December 2002. (Tr. at 73.) Plaintiff testified that she had a headache every day and that it lasted all day, but that the severity of the headaches tapered off when they let her out of the hospital in January 2003. (Tr. at 75.) She also testified that it had been a year since she'd had a headache she considered "extremely severe." (Tr. at 77.) She stated that a physician, Dr. Underwood, diagnosed her headaches, but she testified that she did not see Dr. Underwood more than a month or two because she could not afford him. (Tr. at 73.)

Plaintiff testified that she had three TIA's in 2002, but that she didn't know about them until doctors performed an MRI in response to her complaints about headaches. (Tr. at 89-90.) Plaintiff testified that she did know she'd had one between September and December 2002 because later MRIs showed three TIAs where earlier MRIs had only shown two. (Tr. at 90.) Plaintiff assumed on her own that the headaches were related to the strokes. (Tr. at 91.)

When asked about her medical care, Plaintiff testified that since April 2003, she'd attended the Family Clinic and had seen Carol Star, a registered nurse, about once a month.  (Tr. at 73.) Plaintiff testified that these doctors gave her medications for her blood pressure and diabetes.  (Tr. at 74.)  Plaintiff testified that Nurse Star did not venture an opinion about the cause of her headaches, but "they haven't been as severe, so I don't know that I've really complained about them."  (Tr. at 74-75.)  Plaintiff stated she had high blood pressure and had been on blood pressure medication since the onset of disability. (Tr. at 77-80.)  Plaintiff further testified that after changing medications, her blood pressure had improved.  *Id.*

Plaintiff also testified that her uncontrolled diabetes made her sick and prevented her from working.  (Tr. at 80.)  Plaintiff further stated that she suffered from frequent nausea and would throw up as many as three times a week. (Tr. at 81.)  She testified that these vomiting spells would make her throw up "all day" "whenever she [took] anything in."  (Tr. at 82.)  Plaintiff further testified that her nausea had decreased since 2002, and at the time of her hearing, her vomiting spells occurred once a month.  *Id.*  Plaintiff testified that she was often fatigued and forced to take naps during the day.  (Tr. at 83.)  Plaintiff also testified that she had chest pain once or twice a week at thirty minute intervals that made it difficult for her to work.  *Id.*  Plaintiff had a stent and a stress test prior to the alleged onset of her disability.  (Tr. at 91-92.)

Plaintiff testified that she had recently married and lived in a mobile home with her husband.  (Tr. at 58.)  She stated that she only drove her car once a week to church.  *Id.*  Plaintiff testified that on a regular day, she would get up around 7:30 or 8:00 in the morning and go to sleep between 11:00 and 12:00 at night.  (Tr. at 84.)  Plaintiff claimed her nights were restless, and that she'd only sleep about six hours a night.  *Id.*  After waking, Plaintiff would eat breakfast and take

her medication.  *Id.*  Her daily activities consisted of cleaning her kitchen and home, doing laundry and watching television.  (Tr. at 84-85.)  In addition to housework and television, Plaintiff testified that she often went next door to her mother-in-law's house for a visit.  (Tr. at 85.)  Plaintiff stated that on the weekends, she might leave the house around nine o'clock and walk around Wal-Mart, go shopping, or eat out.  (Tr. at 86.)  Plaintiff testified that she often read during the day.  *Id.*  She stated that she read her Bible at least an hour a day, and that she might read a particularly good book all day until she finished it.  *Id.*

Plaintiff testified that she could reach straight out or over her shoulders and could probably lift up to twenty-five or thirty pounds, but only ten to fifteen comfortably.  (Tr. at 86-87.)  Plaintiff testified that she could stand for about an hour before needing to sit and could walk five or six blocks before needing to stop, and sit for four hours before needing to stand up.  (Tr. at 87.)  However, Plaintiff testified that she had difficulty making change and that she could not write a one-page letter without stopping because her hand would cramp. (Tr. at 88.)  Plaintiff could maintain her hygiene, and had a little knowledge of a computer.  (Tr. at 89.)  Plaintiff testified that she felt she could work if she could get the right job.  (Tr. at 92.)

When questioned by her attorney, Plaintiff testified that she had been diagnosed with Bell's palsy in September 2002.  (Tr. at 92-93.)  Plaintiff further testified that although she had originally filed for disability in 2002, she obtained the position at the Blockbuster warehouse and felt she could resume working.  (Tr. at 94.)  When she ended up back in the hospital, she finally determined that she could no longer work.  (Tr. at 94-95.)  Plaintiff testified that, since the alleged onset of her disability, she had never had a symptom-free month where she would not miss work at least two to three times a month.  (Tr. at 98.)  She testified that her last week of work she had to throw up while

there.  *Id.*

####     b.     *Medical Expert Testimony*

Dr. Sol Freeman, M.D., a medical expert, testified at Plaintiff's hearing and was questioned

by both the ALJ and the Plaintiff's representative.  (Tr. at 100-110.)  After examining the medical

record, Dr. Freeman determined Plaintiff's medical impairments as diabetes, hypertension, heart

disease, diffuse myalgia, and Bell's palsy.  (Tr. at 100-101.)  Dr. Freeman also described Plaintiff's

headaches and abdominal pain in his review of her records, but did not attribute them to either

diabetes or hypertension.  (Tr. at 101.)  With respect to Plaintiff's head scans, he noted that

Plaintiff had had an MRI in September of 2002, which showed "old area of scarring [INAUDIBLE]

acute stroke."  *Id.*  He also described Plaintiff's CT scan in December of 2002, which showed

"some small other areas of disease, but nothing of an acute nature."  *Id.*  Dr. Freeman further

testified that he was familiar with the identified categories in the regulations commonly referred to

as listings, and that Plaintiff's medical impairments did not meet or equal a listing.  (Tr. at 102-

103.)

Dr. Freeman also described Plaintiff's functional limitations.  (Tr. at 103.)  He determined

based on the record that Plaintiff was capable of lifting 25 pounds regularly and 50 pounds

occasionally.  (Tr. at 103.)  He stated that Plaintiff could stand six out of eight hours, or,

conversely, sit six out of eight hours with a sit-stand option.  *Id.*  Dr. Freeman stated that Plaintiff

required a sit-stand option because she testified that she became fatigued after sitting for a long

period of time.  *Id.*  Dr. Freeman further testified that Plaintiff had no environmental or postural

limitations.  *Id.*

On cross-examination by Plaintiff's representative, Dr. Freeman testified that the records

did not indicate Plaintiff's diabetes had ever been controlled. (Tr. at 104.) Dr. Freeman further testified that he could not establish a clear-cut relationship between the inadequate control of Plaintiff's diabetes and her symptoms of nausea, blurred vision, weakness and stomach pain. *Id.* Dr. Freeman testified that his only conclusion was that the symptoms were a "coincidence" and unrelated to her diabetes. *Id.* Dr. Freeman further testified that he could not find any evidence in the record of a mental impairment that would be causing Plaintiff's symptoms. (Tr. at 105.)

When asked by Plaintiff's representative if he felt a psychological evaluation could determine whether there was a psychological basis for the symptoms for which Plaintiff had regularly sought treatment, including chest pain, headaches and nausea, Dr. Freeman replied:

> "I'm not sure that any evaluation, psychological or psychiatric, would indicate that she's had a response to all of these things. But whether or not it would serve to indicate whether [a psychological disorder] was the etiology of her difficulties, I think, is a little – would be a little hard to be understandable, would be difficult to prove."

(Tr. at 109.) When Plaintiff's representative asked the medical expert to clarify this response:

> "You – so you're not – you would not recommend obtaining a psychological evaluation, is that what you're saying?"

the ALJ informed counsel that the medical expert was not there to make that judgment, and that the issue of Plaintiff's need for a psychological consultation was for him to decide. (Tr. at 109-110.)

### c.   *Vocational Expert Testimony*

Suzette Skinner, a Vocational Expert ("VE"), also testified at Plaintiff's hearing. (Tr. at 110-116.) She classified Plaintiff's work at the Blockbuster warehouse and her work at the string machine as medium and unskilled. (Tr. at 110.) The VE classified Plaintiff's work at the shrink wrap machine as medium and unskilled, and her work as a daycare employee as light and semiskilled. *Id.*

With regard to Plaintiff's work before the alleged onset of disability, the VE classified her position as quality control inspector of video tapes as light and skilled with a Specific Vocational Preparation ("SVP") of 5. *Id.* The VE classified Plaintiff's position as a photo lab supervisor as light, skilled work with an SVP of 6. *Id.* The VE described Plaintiff's work as a photo packager as a sorter and packer - a position that is light and semi-skilled with an SVP of 3. *Id.* The VE classified Plaintiff's work as assistant director of a daycare center as sedentary and skilled with an SVP of 7. (Tr. at 111-112.)

The ALJ posed two hypothetical questions to the VE. (Tr. at 112-114.) First, the VE was asked to respond to a hypothetical question which assumed an individual of Plaintiff's age, education and work experience, who was limited to lifting ten pounds regularly, twenty pounds occasionally, could stand six hours out of an eight hour day, could sit six hours out of an eight hour day with an opportunity to alternate positions at one-to-two hour intervals, who could not work with ropes, ladders or scaffolds, could not climb, could perform other postural requirements only occasionally, and could not work a position requiring continuous, constant writing; the VE opined that such individual could perform Plaintiff's past work as a quality control inspector, film processing supervisor and assistant director of a daycare. (Tr. at 112-113.) With respect to these jobs, the VE opined that Plaintiff could perform the work as defined in the Dictionary of Occupational Titles ("DOT"). (Tr. at 113.)

The second hypothetical was identical to the first, but involved an individual who was required to miss between two and three days of work per month due to illness. (Tr. at 113-114.) The VE opined that if the absences were consistent, they would preclude employment. (Tr. at 114.)

When examined by Plaintiff's representative, the VE testified that the maximum tolerance,

in her opinion, for absenteeism in unskilled work was two times a month, consistently.  *Id.*  The VE also testified that this rate of absenteeism would also be acceptable for "low-end, semi-skilled" jobs.  *Id.*

> ### d.      *Closing Argument*

During his closing argument, Plaintiff's representative requested that the ALJ note Plaintiff's possibly high rate of absenteeism that would interfere with her ability to hold competitive employment.  (Tr. at 115.)  Plaintiff's representative also reminded the ALJ that when medical findings "do not substantiate any physical impairment capable of producing the pain or other symptoms," the ALJ was required to develop evidence to that effect. (Tr. at 115-116.)  He concluded by requesting a psychological evaluation for his client.  (Tr. at 116.)

## C.      *ALJ's Findings*

The ALJ denied Plaintiff's application for benefits in a written opinion issued on April 1, 2004.  (Tr. at 39-49.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability, September 1, 2002.  (Tr. at 44.)  The ALJ found Plaintiff's medically determinable impairments to be headaches, high blood pressure, diabetes, coronary artery disease, and obesity.  *Id.*  At steps two and three, he concluded that although these impairments are considered 'severe' within the regulations they did not meet or equal a listing.  *Id.*

The ALJ outlined all of Plaintiff's medical impairments and concluded that they were better with treatment and medical compliance.  (Tr. at 46.)  He noted that Plaintiff herself acknowledged improvement in most areas.  *Id.*  With respect to Plaintiff's nausea, he determined that the severity of nausea is "hardly mentioned in the file." (Tr. at 47.)  He determined that there was insufficient

evidence to conclude that Plaintiff had a psychological problem requiring a psychological

consultation.  (Tr. at 46.)  He further found that Plaintiff had not received the medical treatment

commensurate with a totally disabled individual. (Tr. at 47.) The ALJ also noted that despite the

disabling symptoms Plaintiff alleged, no treating doctor placed restrictions on her activity to

accommodate her symptoms.  *Id.*   The ALJ found plaintiff's testimony "mostly credible but not to

the extent contended."  *Id.*

The ALJ concluded that Plaintiff retained the residual functional capacity to perform a

limited range of light work activities.  (Tr. at 47.)  Using Plaintiff's residual functional capacity and

the VE's testimony, the ALJ concluded that Plaintiff could perform her past relevant work as a

quality control inspector of VHS, a photo lab supervisor and Assistant Director at a daycare. (Tr. at

48.)  Because Plaintiff retained the residual functional capacity to perform her past relevant work,

the ALJ issued a finding of not disabled.  (Tr. at 48-49.)

## II.  ANALYSIS

### A.    *Legal Standards*

#### 1.    <u>Standard of Review</u>

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a

reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not

be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point

during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant

satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step

five to show that there is other gainful employment available in the national economy that the

claimant is capable of performing.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  This

burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations

or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304

(5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is

conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.    *Issues for Review***

Plaintiff presents the following issues for review:

(1)    The ALJ failed in his duty to conduct a full and fair hearing by refusing to allow the medical expert to state an opinion, which prejudiced Plaintiff;

-19-

(2)     The ALJ failed in his duty to conduct a full and fair hearing by refusing Plaintiff's request for a psychological evaluation, which prejudiced Plaintiff; and

(3)     The ALJ and Appeals Council erred in finding that Plaintiff's residual functional capacity allowed her to perform her past relevant work despite a possibly unacceptable degree of absenteeism.

C.      *Issue One: Refusal to Allow Medical Expert to State Opinion*

Plaintiff argues that the ALJ erred in preventing Dr. Freeman from stating an opinion concerning Plaintiff's need for a consultative evaluation.  (Pl.'s Br. at 15.)

The ALJ has a duty to fully and fairly develop the facts relevant to a claim for benefits. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).  A consultative examination may be necessary to develop a full and fair record.  *Wren*, 925 F.2d at 128.  However, the decision to order a consultative examination is within the ALJ's discretion.  *Id.*  Furthermore, failure to develop an adequate record is not per se grounds for reversal.  *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984).  Plaintiff must show that she "could and would have adduced evidence that might have altered the result."  *Carey*, 230 F.3d at 142.  Additionally, a claimant or her representative has the right to question any witnesses at a hearing before the ALJ.  *See* 20 C.F.R. §§ 405.301(c), 405.350(c).  However, an ALJ is not required to accept all of a medical expert's testimony; it is within his discretion to weigh the evidence accordingly.  *Cf. Chevron USA, Inc. v. Heavin*, 204 Fed.Appx. 361, 365 (5th Cir. 2006) (noting ALJ's entitlement to weigh the testimony of experts in a disability claim where district court review was sought by claimant's employer).

Plaintiff argues that Dr. Freeman's answer at the hearing regarding a need for consultative examination was sufficiently unclear to merit a follow-up clarification question, and that the ALJ was required to allow Dr. Freeman to answer the follow-up question.  (Pl.'s Br. at 16.)  In support, Plaintiff cites cases in which claimants were denied the opportunity to cross-examine witnesses at

-20-

all.  *See Tanner v. Secretary of HHS,* 932 F.2d 1110, 1113 (5th Cir. 1991) (remand necessary when

ALJ based disability determination on vocational report when Plaintiff was not afforded the

opportunity to cross-examine vocational expert); *Lidy v. Sullivan,* 911 F.2d 1075, 1077 (5th Cir.

1990) (remand necessary when ALJ relied on written medical expert testimony to determine

disability and Plaintiff was not afforded the opportunity to cross-examine medical expert).  In

contrast to those cases, however, Dr. Freeman testified in person at Plaintiff's hearing, she was

afforded the opportunity to question him at length, and she was also permitted to ask and initially

elicit a response as to whether or not he felt a psychological examination was necessary.

Even assuming that the ALJ erred in failing to allow Dr. Freeman to clarify his opinion,

Plaintiff has not adequately shown that she "could and would have adduced evidence that might

have altered the result."  *Carey*, 230 F.3d at 142.  Plaintiff speculates that:

> had the ALJ permitted Dr. to state a clear opinion as to whether a psychological evaluation
> would be useful, it is certainly possible that Dr. Freeman's opinion would have been in the
> affirmative. Such opinion evidence would not have been binding on the ALJ, but had he
> accepted it and ordered a psychological evaluation, the results of the evaluation might well
> have altered the ALJ's decision.  (Pl.'s Br. at 17-18.)

However, prior to the ALJ's interruption, Plaintiff questioned Dr. Freeman at length regarding

Plaintiff's symptoms and their possible correlation to a physical or mental disease.  Dr. Freeman

could not establish a clear-cut relationship between Plaintiff's diagnosed impairments and her

symptoms, and he also noted that he could not find any evidence in the record of a mental

impairment.  (Tr. at 105.)  In fact, his original answer to Plaintiff's question regarding the necessity

of a psychological evaluation suggests that he felt it would not be helpful:

> "I'm not sure that any evaluation, psychological or psychiatric, would indicate that she's
> had a response to all of these things. . .whether or not it would serve to indicate whether [a
> psychological disorder] was the etiology of her difficulties . . . would be hard to prove."

(Tr. at 109.)  Additionally, even if Dr. Freeman had opined that a psychological consultation was necessary, the ALJ would not have been required to accept that opinion. *See Wren*, 925 F.2d at 128 (the decision to order a consultative examination is within the ALJ's discretion); *Cf. Alejandro v. Barnhart,* 291 F.Supp.2d 497, 515 (5th Cir. 2003) (noting that the ALJ is not bound to opinions of medical or psychological consultants, but must consider them when they are offered).

Finally, a failure to address a medical opinion will not prejudice Plaintiff if substantial evidence supports the ALJ's decision.  *See Alejandro,* 291 F.Supp.2d at 515.  In order to properly determine if the Plaintiff has been prejudiced by the ALJ's failure to allow Dr. Freeman to clarify his opinion, the Court must determine if substantial evidence supports the ALJ's decision not to order a psychological consultation, i.e., that the record did not suggest a need for further evaluation.  *See Brock v. Chater,* 84 F.3d 726, 728 (5th Cir. 1996) (consultative examination is only necessary when the claimant presents sufficient evidence to raise a suspicion concerning a non-exertional impairment).  As that is the essence of Plaintiff's second argument, the Court now turns to that issue.

**E.      *Issue Two: Refusal to Order a Psychological Consultative Evaluation***

Plaintiff argues that the ALJ erred by not granting her request for a consultative examination because she offered sufficient evidence of a non-exertional impairment.  (Pl.'s Br. at 18.)  Plaintiff argues that she has sufficiently raised hypochondriasis as a non-exertional impairment requiring a consultative examination.  (Pl.'s Reply Br. at 4.)  Additionally, Plaintiff points to two medical reports in which her general mood is characterized as "anxious" as well as her own testimony at the hearing that she was "not thinking clearly. . . a little nervous," in an attempt to allege a mood disorder.  (Pl.'s Br. at 19.)  Finally, Plaintiff argues that the medical

record before the ALJ and additional evidence submitted to the Appeals Council sufficiently raised the suspicion that her lacunar infarctions may cause a non-exertional impairment. (Pl.'s Reply Br. at 4.)  The Commissioner maintains that the record does not indicate a need for a consultative evaluation. (Def.'s Br. at 4-5.)

As previously outlined, the decision to require a consultative examination is within the ALJ's discretion.  *Wren*, 925 F.2d at 128. A consultative examination is only required when the record demonstrates it is necessary for the ALJ to make a determination.  *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977).  "Isolated comments by a claimant are insufficient, without further support, to raise a suspicion" of an impairment.  *Brock,* 84 F.3d at 728.

### 1.  Hypochondriasis

Plaintiff's only allegation of hypochondriasis was in her representative's closing argument at the hearing before the ALJ.  (Tr. at 116.)[4]  Plaintiff's medical care providers never mention the possibility of hypochondriasis in their medical assessments.  Dr. Freeman, in his discussion of Plaintiff's records, confirmed this fact when he opined that Plaintiff's symptoms were not indicative of a mental impairment, "unless it were hypochondriasis, and I have nothing to base that on."  (Tr. at 105.)  A single mention of hypochondriasis by Plaintiff's representative at her disability hearing is an "isolated comment" that does not sufficiently raise the suspicion of a non-exertional impairment.  *See Brock,* 84 F.3d at 728.

### 2.  Anxiety

Unlike hypochondriasis, Plaintiff did not orally allege anxiety at her disability hearing. The majority of Plaintiff's medical records categorized her moods as normal, or stated that she appeared

---

[4]Plaintiff's representative closed the hearing with a request for a psychological evaluation, "because this does look like hypochondriasis to some degree, or some type of somatozation disorder."  (Tr. at 116.)

in "no acute distress."  (Tr. at 323, 479, 513, 529, 530, 532, 543.)  The record suggests that medical care providers never gave specific attention, stated opinions on, or requested treatment for Plaintiff's noted anxiety.  (Tr. at 529, 532.)  The multitude of instances where Plaintiff's mood was noted as "normal" render the occasional "anxious" notation as isolated and insufficient to raise the suspicion of a non-exertional impairment.  *See Brock*, 84 F.3d at 728.

### 3.   Lacunar Infarctions

Unlike the allegations of hypochondriasis and anxiety, Plaintiff's lacunar infarctions are well documented in the record as part of Plaintiff's medical history.  However, although medical care providers were aware of Plaintiff's infarctions, they never prescribed specific treatment for them.[5]  (Tr. at 292, 295, 323, 328, 336.)  In fact, the infarctions were described in medical records as "stable."  (Tr. at 326, 330.)  No medical care provider linked Plaintiff's lacunar infarctions with a somatoform disorder or suggested that the lacunar infarctions might cause a non-exertional impairment.  In Dr. Underwood's February 7, 2003 letter, he explicitly mentions "cerebral infarctions of the brain" as one of Plaintiff's diagnoses.  (Tr at 431.)  However, although he scheduled appointments for a cardiologist, an OB/GYN and a gastrointerologist, he did not recommend any neurological or psychiatric care.  (Tr. at 431-432.)  As the medical record before the ALJ did not suggest that Plaintiff's lacunar infarctions were the cause of a non-exertional impairment, he was not required to order a consultative examination.  *See Leggett v. Chater,* 67 F.3d 558, 566 (5th Cir.1995) ("The ALJ's duty to investigate ... does not extend to possible disabilities that are not alleged by the claimant or to those disabilities that are not clearly indicated on the record.").

---

[5] The only neurological treatment prescribed for Plaintiff was in September 2002 after her diagnosis of Bell's Palsy.  (Tr. at 449.)  This treatment included medication, eye drops and an eye patch.  *Id.*

Plaintiff argues that the journal article submitted to the Appeals Council[6] sufficiently tied her lacunar infarctions to a possible non-exertional impairment. (Pl.'s Br. at 19-20.)  The Appeals Council reviewed this additional evidence in its decision denying review, stating:

> We considered the contentions raised in your representative's brief dated August 12, 2004 regarding abnormalities noted in the MRI examination of the claimant's brain performed in September 2002 and December 2002 (citations omitted). These studies show three small lacunar infarcts which were stable. However, subsequent records show no evidence of neurological deficit, physically or mentally.

(Tr. at 6.)

This additional evidence presented to the Appeals Council is not sufficient to raise a suspicion that Plaintiff's infarctions may cause a non-exertional impairment.  The article details a small study taken on select individuals, and is an "isolated comment" when compared with a vast medical record wherein medical care providers who directly treated Plaintiff did not conclude that her infarctions may cause secondary symptoms or non-exertional impairments.  *See Brock*, 84 F.3d at 728.  For the reasons listed above, there was no error in the decision not to order a consultative examination.  Because there was no error, Plaintiff has not been prejudiced by any failure on the part of the ALJ to allow Dr. Freeman to clarify his opinion on the need for a consultative examination.

**F.      Issue Three: Erroneous Findings of Residual Functional Capacity to Perform Past Work**

Plaintiff argues generally that the findings that she retained the residual functional capacity to perform her past relevant work without an unacceptable degree of absenteeism are not supported by substantial evidence.  (Pl.'s Br. at 21.)  In support of her contention, Plaintiff identifies three

---

[6]"Decreased Capacity for Mental Effort After Single Supratentorial Lacunar Infarct May Affect Performance in Everyday Life" from the 65 Journal of Neurology, Neurosurgery and Psychiatry 697-702 (November 1998) (Tr. at 16-28.)

specific errors: (1) the ALJ's failure to cite specific medical evidence, the ALJ's improper

credibility analysis, and the Appeals Council's failure to afford Dr. Perks's opinion proper weight.

(Pl.'s Br. at 21-26.)  The Court addresses each of these alleged errors in turn, although not in the

order raised.

### 1. ALJ's Treatment of Medical Evidence

Plaintiff argues that the ALJ did not cite to specific medical evidence to support his

conclusions that Plaintiff's conditions improved when she took her medication. (Pl.'s Br. at 25.)

Plaintiff also argues that he failed to consider the combined effects of her impairments.  (Pl.'s Br. at

26.)  The Commissioner argues that the Plaintiff has not demonstrated that the ALJ's findings were

incorrect. (Def.'s Br. at 9.)

### a. *Medical Evidence Supporting the ALJ's Conclusions*

 "That the ALJ did not specifically cite each and every piece of medical evidence

considered does not establish an actual failure to consider the evidence." *Castillo v. Barnhart,* 151

Fed.Appx. 334, 335 (5th Cir. 2005) (citing *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir.1994)

(rejecting as unnecessary rule requiring ALJ to specifically articulate evidence that supported

decision and discuss evidence that was rejected).  If the ALJ's decision indicates that he properly

considered and referenced the relevant evidence before making his decision, failure to cite specific

medical evidence is not error.  *See id.*

In this case, although the ALJ did not cite to specific documents when stating that Plaintiff

improved with medical monitoring, the record reflects that he thoroughly reviewed her relevant

medical records at the outset of his decision.  (Tr. at 44-45.)  As he reviewed these records, the ALJ

outlined Plaintiff's symptoms at her medical visits and the diagnoses offered by her treatment

providers. *Id.* The medical record confirmed that Plaintiff's high blood sugar was reduced with medication on three occasions since the alleged onset of her disability.[7] (Tr. at 460-61, 479, 517.) Furthermore, Plaintiff's medical visits, at which she complained of headaches, nausea, high blood sugar or high blood pressure, often coincided with her statements that she was out of her prescribed medication. (Tr. at 478, 527, 528.) The ALJ also noted that Plaintiff's treatment records did not reflect additional restrictions imposed by medical doctors, and that Plaintiff had not received the type of medical treatment one would expect for a totally disabled individual. (Tr. at 47.) These conclusions are also supported by medical evidence: Plaintiff's doctors regularly advised Plaintiff to continue with her current medications when she sought medical attention for her various symptoms and never imposed other restrictions to accommodate her alleged complaints. (Tr. at 527, 528, 529, 530, 531, 543.) *See generally Vaughn v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (citing *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir.1989) (substantial evidence supported ALJ's finding that claimant's subjective symptomology was not credible when no physician on record stated that claimant was physically disabled). (Tr. at 80.) Although the ALJ did not explicitly cite medical evidence for each of these conclusions, the his decision indicates that he adequately considered the medical record when making his determination.

Because the record reflects that he adequately reviewed and considered Plaintiff's relevant medical records, and there is substantial evidence in the medical record to support his finding of not disabled, the ALJ's failure to cite specific medical evidence for his conclusions was not error.

      **b.**       ***Combined Effects of Plaintiff's Medical Impairments***

Plaintiff also contends that the ALJ did not consider the effects of her medical impairments

---

[7]The alleviation of Plaintiff's high blood sugar was only noted on occasions where she was admitted and additional blood tests were taken after Plaintiff had received treatment. (Tr at 460-461, 479, 517)

combined.  However, the ALJ mentioned Plaintiff's combined, severe impairments in his opinion.
(Tr. at 44.)  He specifically noted that he must determine whether Plaintiff's disabilities, either
singly or in combination, equals a listing.  (Tr. at 44.)  In findings four and eight, the ALJ listed all
of Plaintiff's medically determinable impairments when making his determination that they were
severe but did not prevent her from performing her past work.  (Tr. at 49.)  *See Owens v. Heckler*,
770 F.2d 1276, 1282 (5th Cir. 1985) (ALJ's mention of his consideration of impairments both
singly and in combination, when supported by substantial evidence, was proper); *Tamez v.
Sullivan*, 888 F.2d 334, 336 (5th Cir. 1989) (when ALJ's determination is supported by substantial
evidence, the mention of his impairments in combination is not merely a "formulaic cant" but
rather a decision based on evaluating Plaintiff's abilities).  Because the ALJ's decision reflects that
he considered Plaintiff's impairments both singly and in combination, and his decision is supported
by substantial medical evidence, the ALJ did not err.

### 2. Credibility Determination

Plaintiff also argues that the ALJ's decision is not supported by substantial evidence
because he failed to conduct a proper credibility analysis.  In particular, she alleges, the ALJ
provided inadequate, incorrect reasons for his credibility conclusions, concluded that Plaintiff's
symptoms were not disabling without addressing her ability to afford medical care, and improperly
evaluated Plaintiff's daily activities.  (Pl.'s Br. at 23-25.)

### a. *Adequacy and Consistency of Credibility Analysis*

"Credibility determinations are generally the province of the ALJ and are entitled to
deference."  *Lam v. Apfel*, 2000 WL 354393 at *4 (N.D. Tex. Apr. 5, 2000).  Therefore, courts will
reverse an ALJ's credibility determination only if it is "patently wrong."  *Jens v. Barnhart*, 347

F.3d 209, 213 (7th Cir. 2003).   The ALJ's "determination or decision must contain specific reasons

for the finding on credibility, supported by the evidence in the case record, and must be sufficiently

specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator

gave to the individual's statements and the reasons for that weight."   SSR 96-7p.   "If on [42

U.S.C.] § 405(g) review the court finds that the ALJ followed the proper procedures and considered

the relevant factors, the ALJ's determination is ordinarily conclusive."   *Lechner v. Barnhart*, 321 F.

Supp. 2d 1015, 1027 (E.D. Wis. 2004).

> The Plaintiff contends that the entirety of the ALJ's credibility analysis was as follows:
>
> I find that the claimant's testimony is mostly credible but not to the extent contended. There
> are inconsistences in her testimony on what the record shows. After careful review of the
> file, I cannot find the degree of nausea testified to by the claimant, and there is some
> exaggeration of symptoms by the claimant."

(Tr. at 47.)   However, this cited paragraph is the conclusion of a comprehensive credibility

analysis wherein the ALJ analyzed each of Plaintiff's symptoms, including nausea, headaches,

chest pain and diabetes, and provided reasons for discrediting her testimony regarding their

severity. (Tr. at 46-47.)   For instance, after noting that the record confirmed Plaintiff's intermittent

headaches, the ALJ found that the record did not support her allegations of frequency.  (Tr. at 47.)

After noting Plaintiff's testimony regarding nausea, the ALJ concluded that the severity of nausea

was hardly mentioned in Plaintiff's record.  (Tr. at 47.)   The ALJ also noted Plaintiff's chest pain

and cited medical evidence to support his conclusions that it was not disabling.  (Tr. at 47.)   He

referenced her diagnoses of diabetes and determined that it improved with medication and proper

diet.  (Tr. at 47.)   The ALJ's credibility analysis was adequate as his decision specifically

addressed Plaintiff's symptoms, and he offered reasons for discrediting Plaintiff's testimony.  *See*

SSR 96-7p; Harvey *v. Astrue*, 2007 WL 1017038 at *2 (W.D. Tex. Mar. 27, 2007) (ALJ's

credibility determination was proper when he specifically cited Plaintiff's testimony and found it unsupported by the record).  Although the ALJ only explicitly mentions credibility in the paragraph which Plaintiff cites to, "we give the opinion a commonsensical reading rather than nitpicking at it."  *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir.1999).

Plaintiff further argues that the ALJ's conclusion that her testimony is inconsistent with the record is not supported by substantial evidence. (Pl.'s Br at 23-24.)  Plaintiff specifically points to the ALJ's conclusion that the degree of nausea testified to by the Plaintiff was not supported by the medical record. (Tr. at 47.)

The ALJ's credibility determinations must be supported by medical record evidence. *See* SSR 96-7p.  Plaintiff testified that she had an upset stomach and was often throwing up, sometimes as many as three times a week.  (Tr. at 81.)  Plaintiff further testified that when she had a vomiting spell, she would often throw up all day, whenever she took anything in.  (Tr. at 82.)  Plaintiff testified that her nausea decreased when she began seeing Dr. Underwood, around the end of 2002. (Tr at 82.)  Although she previously threw up as many as three times a week, since the end of 2002, the vomiting spells occurred once a month.  (Tr. at 82.)

The Court agrees with Plaintiff that her testimony regarding nausea is consistent with the evidence in the medical record.  Treatment records indicate she exhibited symptoms of constant, continuous nausea paralleling what she described at the hearing in late 2002 and early 2003.  (Tr. at 295, 333, 341.)  However, after January 2003, Plaintiff's medical records indicate that her complaints of nausea declined; of the eight times she sought medical attention from January 2003 until her hearing in February 2004, she only listed nausea as a primary symptom once, on October 13, 2003.  (Tr. at 511.)  She also complained of nausea associated with severe abdominal pain and

extremely high blood sugar, on April 11, 2003 and June 4, 2003, respectively.  (Tr. at 478, 491.)

The ALJ's conclusion that Plaintiff's subjective testimony regarding her nausea was inconsistent

with the medical record is not supported by substantial evidence.

Nevertheless, Plaintiff has failed to show how the ALJ's conclusion prejudiced her claim

for disability.  The medical record confirms that her nausea steadily decreased since 2002 to the

point that she only suffered from intense nausea once a month.  Plaintiff has not offered arguments

as to why the ALJ's credibility determination on this issue would change the outcome of her

disability claim upon remand.  *See Prince v. Barnhart,* 418 F.Supp.2d 863, 874 (5th Cir. 2005)

(remand for error in credibility determination not required when Plaintiff did not raise or argue the

issue of prejudice, and when independent review did not suggest that further credibility analysis

would have led the ALJ to formulate a different conclusion).  Plaintiff has not fulfilled her burden

to show that prejudice resulted from the ALJ's error.

### b.    *Plaintiff's Ability to Secure Medical Treatment*

Plaintiff also argues that because she cannot afford medical treatment, the ALJ improperly

discounted her credibility by noting that she had "significant gaps in her treatment history" and did

not comply with her medication and diet.  (Pl.'s Br. at 24.)  "A medical condition that can

reasonably be remedied either by surgery, treatment, or medication is not disabling. If, however,

the claimant cannot afford the prescribed treatment or medicine, and can find no way to obtain it,

'the condition that is disabling in fact continues to be disabling in law.'"  *Lovelace v. Bowen,* 813

F.2d 55, 59 (5th Cir. 1987).  Inability to pay for medical treatment is a crucial issue only if the ALJ

determines that (1) an impairment is disabling, (2) treatment of the impairment is expected to

restore ability to work, and (3) the claimant has failed to follow the prescribed treatment.  *See* SSR

82-59.  Under those circumstances, inability to pay for prescribed treatment, combined with

absence of free community resources, constitutes a justifiable reason for failure to follow treatment.

*Id.*

In this case, the ALJ made no findings regarding Plaintiff's ability to procure treatment.

However, the Plaintiff failed to argue or show that the ALJ's failure to make this finding prejudiced

her.  Evidence in the record before the ALJ indicates that Plaintiff chose to utilize accessible

community treatment; many of Plaintiff's records are from the Greenville Community Health

Clinic, where she received frequent medical attention.  (Tr. at 527-533.)  When Plaintiff claimed

her medication had run out and she could not afford more, she was given samples.  (Tr. at 530,

533).  Several care providers also ordered her full prescriptions without noting her inability to pay

for them.  (Tr. at 527, 528, 530.)  In addition, Plaintiff's testimony at the hearing suggested that she

frequently received medical care and took medications for her conditions.  (Tr. at 74, 77-79.)

Although Plaintiff testified that she could not afford Dr. Underwood, she later elaborated on the

medical professionals who did treat her.  (Tr. at 73-74.)  On her paperwork requesting a hearing,

Plaintiff noted that she was currently taking four medications, indicating that she was capable of

regularly obtaining them.  (Tr. at 206.)  Plaintiff's "numerous references" of inability to afford

treatment are in fact limited to three, made approximately every six months from October 2002 to

October 2003, and each were followed with free medical attention and medication.  (Tr. at 528,

533, 543.)  All of this evidence suggests that community resources were available to the Plaintiff

and that she utilized them to get proper medical attention and medications. While the ALJ did not

make explicit findings as to Plaintiff's ability to procure treatment, Plaintiff has not demonstrated

that the ALJ's failure to address it prejudiced her disability claim.  *See Tamez v. Sullivan,* 888 F.2d

334, 336 (5th Cir. 1989) (ALJ's determination that diabetes was remediable with medication

upheld where the record did not support Plaintiff's contention that he could not afford his

medication and the ALJ's decision was supported by substantial evidence). As the Court has

already determined that the ALJ's finding of no disability is supported by substantial evidence, the

ALJ did not err in failing to make explicit findings as to the Plaintiff's ability to afford medical

treatment.

### c.    *Plaintiff's Daily Activities*

Plaintiff further argues that the ALJ's credibility analysis was improper because he

inappropriately discredited her daily activities.  (Pl.'s Br at 25; Tr.at 47.)  Plaintiff correctly argues

that in assessing a social security claimant's credibility, an ALJ should look to, among other

factors, a claimant's daily activities.  *See* SSR 96-7p.

Contrary to Plaintiff's contention, the ALJ *did* consider Plaintiff's testimony regarding her

daily activities.  He summarized them and outlined the specific limitations to which she testified.

(Tr. at 45.)  Furthermore, the ALJ offered his reasons for discrediting the Plaintiff's daily activities,

noting:

> [E]ven if the claimant's daily activities are truly as limited as alleged, it is difficult to
> attribute that degree of limitation to the claimant's medical condition. . . in view of the
> relatively weak medical evidence and other factors discussed in this decision."

(Tr. at 47.)  The ALJ outlined Plaintiff's daily activities as part of his credibility analysis, and

substantial evidence exists to support his conclusion that the limited activities Plaintiff testified to

were not consistent with the medical evidence in the record. *See Washington v. Barnhart,* 2005 WL

1355109, at *5-6 (W.D. Tex. Jun. 7, 2005) (where the ALJ outlined the Plaintiff's testimony

regarding her daily activities and concluded they were inconsistent with the substantial evidence of

the record, there was sufficient basis for his credibility determination).  As the Court has already

determined that substantial evidence supports the ALJ's finding of not disabled,  ALJ did not err.

### 3.     Medical Opinion Evidence

Plaintiff also argues that the Appeals Council did not afford proper weight to Dr. Perks's

opinion that Plaintiff would be likely to miss more than two days of work per month "due to the

combined effects of her poorly controlled diabetes, episodic chest pain, TIA's, anxiety and episodic

headaches." (Pl.'s Br. at 21-22.)  Plaintiff argues that, as a treating source, Dr. Perks's opinion

should have been afforded controlling weight, or, alternatively, that the Appeals Council should

have examined the six factors required by 20 C.F.R. §§ 404.1527(d), 416.927(d) in determining

what weight to afford it. *Id.*  The Commissioner responds that proper weight was given to Dr.

Perks's opinion because he was not a treating source and did not provide medical evidence or

findings to support his opinion.  (Def.'s Br. at 5-6.)

### a.     *Treating Source*

A treating source is defined as "a physician or psychologist 'who provides you, or has

provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment

relationship with you.'"  *Richardson ex rel. C.R. v. Barnhart*, 338 F.Supp.2d 749, 759 (5th Cir.

2004) (citing 20 C.F.R. § 416.902).  "Generally, an ongoing treatment relationship exists 'when the

medical evidence establishes that you see, or have seen, the source with a frequency consistent with

accepted medical practice for the type of treatment and/or evaluation required.'"  *Id.*  "'[T]he longer

a treating source has treated [the claimant] and the more times [the claimant has] been seen by a

treating source, the more weight [the SSA] will give to the source's medical opinion.'"  *Id.*  (citing

20 C.F.R. § 416.927(d)(2)(I)).  Treating source opinions are accorded controlling weight when they

are well-supported by medically acceptable clinical and diagnostic  technique and not inconsistent

with other substantial evidence in the record.  *See Frank v. Barnhart,* 455 F.Supp.2d 554, 557-58

(5th Cir. 2006).

In a letter denying review of Plaintiff's claim, the Appeals Council stated:

"We have also considered Dr. Perk's [sic] statement, dated March 1, 2004.  The treatment
records do not indicate that Dr. Perk [sic] had significant recent contact with the claimant
and do not reflect significant objective abnormality demonstrating end-organ damage or
neurological or musculoskeletal impairment.

(Tr. at 6.)  As the Plaintiff admits, and the record confirms, the only time Dr. Perks personally

examined Plaintiff was on September 7, 2002.  (Pl.'s Br. at 22, Tr. at 449.)   Furthermore, in his

opinion, Dr. Perks conceded that although he concluded Plaintiff was likely to miss two or more

days per month due to her symptoms, he could not determine if this degree of absenteeism had

existed since October 11, 2002, because Plaintiff had not sought treatment with his clinic from May

2002 to March 2003. (Tr. at 574.)  This evidence does not support Plaintiff's contention that Dr.

Perks provided sufficient regular medical care to be considered a treating source.

Plaintiff further argues that because Dr. Perks is "privy to the notes made by physician's

assistants who did examine Plaintiff" and "presumably supervised them," he should be considered

a treating source.  (Pl.'s Br. at 22.)  However, there is no evidence in the record to support

Plaintiff's argument that Dr. Perks actually undertook a supervisory role by routinely reviewing

Plaintiff's records and supervising the individuals who directly provided medical attention.

Additionally, Plaintiff has failed to show why a "presumably" supervisory role should entitle Dr.

Perks's opinion to greater weight as a treating source despite evidence that he only directly treated

the Plaintiff on a single occasion.  *See Trimble v. Sec. of HHS,* 1992 WL 235888 at *4 (N.D. Miss.

Jul. 01, 1992) (citing *Oldham v. Schweiker,* 660 F.2d 1078, 1084 (5th Cir. 1981)) ("Theoretically,

the treating physician has examined the claimant on a number of occasions and consequently has a greater familiarity with the patient than a physician who has reviewed the medical evidence, but has examined the patient on one occasion or not at all"). *See also Richardson,* 338 F.Supp.2d at 759-760 (ALJ not required to give physician's opinion controlling weight when he treated Plaintiff on a single occasion).

The Court also notes that the Appeals Council pointed to conflicting evidence within the medical record to support its decision not to afford Dr. Perks's opinion controlling weight. *See Frank v. Barnhart,* 455 F.Supp.2d 554, 557-58 (5th Cir. 2006) (treating source opinion must not be inconsistent with the substantial evidence in the medical record). Dr. Perks offered a conclusory opinion that Plaintiff would have a rate of absenteeism high enough to preclude consistent employment, but cited no medical evidence to support his conclusion. (Tr at 574.) Conversely, Dr. Freeman, the medical expert, summarized the entirety of Plaintiff's medical evidence at her disability hearing and testified that Plaintiff suffered no secondary complications from diabetes, no end organ damage and no musculo-skeletal limitations. (Tr. at 100-101.) He also stated that the medical records did not suggest musculo-skeletal limitations. (Tr. at 101-103.) The Appeals Council noted both of these conclusions when discrediting Dr. Perks's opinion.

Additionally, as the Court previously addressed, the medical record supports the ALJ's conclusions that no medical treatment providers found Plaintiff's condition disabling, imposed restrictions on the Plaintiff to accommodate her allegedly totally disabling symptoms, and that Plaintiff was rarely prescribed treatment other than a continuation of her current medication and a diabetic diet. (Tr. at 348, 479, 491, 511, 528, 530.) As Dr. Perks provided no evidence to support his opinion that Plaintiff would miss more than two days of work per month due to her symptoms,

and other evidence from the medical record supported the ALJ's decision that Plaintiff was not

disabled, there was no error in failing to accord Dr. Perks's opinion controlling weight.  *See*

*Higginbotham v. Barnhart,* 163 Fed.Appx. 279, 282 (5th Cir. 2006) (treating physician's

conclusory statement offered to Appeals Council did not contain supporting evidence and therefore

could not overcome the substantial evidence supporting the ALJ's decision), *Warncke v. Harris,*

619 F.2d 412, 417 (5th Cir. 1980) (physician's letter lacked persuasive weight when it was brief,

conclusory and unsupported by medical findings); *Campbell v. Apfel,* 1999 WL 33537205 at *3

(N.D. Miss Aug. 26, 1999) (ALJ did not err in rejecting treating physician's diagnosis of disability

when, unlike other medical opinions in the record, it was unsupported by additional medical

findings).  Accordingly, the Appeals Council did not err in failing to accord Dr. Perks's opinion

controlling weight.

### b.  *20 C.F.R. § 404.1527(d) Factors*

Plaintiff argues, in the alternative, that the Appeals Council erred in not examining the six

factors outlined in 20 C.F.R. § 404.1527(d) to determine what weight to accord Dr. Perks's

opinion.  Plaintiff argues that, at most, the Appeals Council addressed only two of the six factors:

"frequency of examination" and "support for the opinion provided by other record evidence." (Pl.'s

Br. at 23.)

Before according a medical opinion specific weight, the Commissioner must analyze the

factors outlined in 20 C.F.R. § 404.1527(d).  *See Frank v. Barnhart,* 455 F.Supp.2d at 565; *Newton

v. Apfel,* 209 F.3d 448, 456 (5th Cir. 2000).  These factors include length of treatment, frequency of

examination, nature and extent of the treatment relationship, support for the opinion provided by

other record evidence, the consistency of the opinion with the record, and the opining physician's

area of specialization.  *See* 20 C.F.R. § 404.1527(d).

The Court agrees that the Appeals Council did not explicitly develop four of the factors. However, Plaintiff has not shown that prejudice resulted from this error.  Evidence in the record regarding the length, nature and extent of Dr. Perks's treatment of the Plaintiff does not suggest that further examination of these factors would have adduced evidence that might have altered the result, as Dr. Perks's direct treatment of Plaintiff occurred only once. *Carey*, 230 F.3d at 142. Furthermore, after carefully reviewing the record, the Court notes that there are no additional medical opinions within the record that corroborate Dr. Perks's conclusion that Plaintiff could not sustain employment due to an unacceptable degree of absenteeism, and substantial evidence supports the ALJ's finding that Plaintiff's medical care providers have not imposed any limitations on her, including refraining from work.  Additionally, Plaintiff has not offered evidence that Dr. Perks's area of specialization would entitle his opinion to greater weight.  "Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen,* 837 F.2d 1362, 1364 (5th Cir. 1988).  Plaintiff has not demonstrated that the failure of the Appeals Council to address the four additional factors in 20 C.F.R. § 404.1527(d) affected her substantial rights.

### III.   CONCLUSION

For the above reasons, the Court recommends that Plaintiff's motion be **DENIED,**  the *Defendant's Motion for Summary Judgment* be **GRANTED**, and the Commissioner's decision be wholly **AFFIRMED**.

SIGNED on this 19th day of May, 2007.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE